Jaehyun Oh (5668512)
**THE JACOB D. FUCHSBERG LAW FIRM, LLP**
3 Park Avenue, 37th Floor
New York, New York 10016
*Attorneys for Plaintiff*

### UNITED STATES DISTRICT COURT
### FOR THE NORTHEN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSE L. HERNANDEZ Jr., as Administrator of the Estate of JOSE LUIS HERNANDEZ, Deceased, and on behalf of All Distributees and Next of Kin,<br><br>Plaintiff,<br><br>-against-<br><br>J. WALDRON, U.C., SOHAIL GILLANI, M.D., SHANNA BALL, R.N., CORRECTIONAL OFFICER DERECK T. FLEMING, CORRECTIONAL OFFICER TRAVIS J. VIAU, and JOHN AND JANE DOES 1-10,<br><br>Defendants. | Civil Action No.:<br>9:20-cv-01581 (DNH) (TWD)<br><br>ECF Case<br><br><br>**AMENDED COMPLAINT<br>AND<br>JURY DEMAND** |

Plaintiff JOSE L. HERNANDEZ Jr., as Administrator of the Estate of JOSE LUIS HERNANDEZ, Deceased, and on behalf of All Distributees and Next of Kin, including JOSE L. HERNANDEZ Jr. himself, by and through his attorneys, The Jacob D. Fuchsberg Law Firm, LLP, for his Complaint against Defendants as above captioned, alleges as follows:

#### PRELIMINARY STATEMENT

1.      Plaintiff JOSE L. HERNANDEZ Jr.'s biological father JOSE LUIS HERNANDEZ (hereinafter "Decedent" or "Mr. Hernandez") was a prisoner serving time in the custody of New York State Department of Corrections and Community Supervision (hereinafter "DOCCS") starting on or around June 14, 2018. On June 27, 2019, Mr. Hernandez committed suicide at 37 years of age as a direct and proximate result of Defendants' deliberate indifference, recklessness,

gross negligence, negligence, and professional malpractice in providing medical care and treatment to Mr. Hernandez.

2.      For several weeks leading up to his death, Mr. Hernandez's psychological condition became progressively worse while Defendants deliberately disregarded the gravity of his numerous complaints about suicidal ideation. These complaints should have resulted in an immediate transfer of Mr. Hernandez for inpatient psychiatric care, which would have allowed for proper diagnosis and treatment of his acute psychiatric condition and saved his life. Defendants refused and failed to provide proper supervision including one-on-one Suicide Watch despite recurrent, explicit indications of Mr. Hernandez's suicidality.

3.      Mr. Hernandez first reported suicidal ideation to Defendants on or around May 28, 2019 when he stated that he had tried to hang himself with a towel, had defecated, and cleaned himself. At this point, according to DOCCS's own protocols as well as the applicable standards of psychiatric care, Defendants should have promptly provided Mr. Hernandez with a 24-hour Suicide Watch and a referral for inpatient psychiatric treatment. DOCCS personnel briefly placed Mr. Hernandez on a Suicide Watch from on or around May 28, 2019 through May 30, 2019, apparently acknowledging the seriousness of Mr. Hernandez's condition. However, subsequently, Defendants made an inexplicable decision to discharge Mr. Hernandez from Suicide Watch on or around May 30, 2019 and from observation status altogether on June 3, 2019.

4.      For most of the next four weeks leading up to his death, Mr. Hernandez was placed in a solitary prison cell in General Population unit of Clinton Correctional Facility with improper monitoring and grossly inadequate mental health services. In effect, this solitary confinement operated the same way as disciplinary or punitive segregation, depriving Mr. Hernandez of an

ability to seek support from his loved ones and further subjecting him to cruel and unusual punishment.

5.    Defendants allowed Mr. Hernandez to have access to a sharp object in his cell and deliberately disregarded his possession of same. From on or around May 31, 2019 through on or around June 22, 2019, Mr. Hernandez cut his bilateral wrists leaving visible marks, which Defendants saw and disregarded. In addition, throughout this time, Mr. Hernandez expressed increasing symptoms of suicidal ideation to Defendants and verbally pleaded for proper mental health treatment and psychiatric medications to be provided. Defendants ignored these pleas and refused to provide proper psychiatric assessments and treatment including but not limited to inpatient care and monitoring.

6.    On or around June 22, 2019, Mr. Hernandez was admitted for observation in a mental health unit within Clinton Correctional Facility when he stated to an infirmary nurse that he wishes to hang himself and "just die." Defendants still refused to refer Mr. Hernandez for one-on-one Suicide Watch or a psychiatric hospital level of care.

7.    The first time Mr. Hernandez was even placed on mental health medication was on June 24, 2019, by which point he was expressing that he *will* kill himself if he were placed back in General Population. Mr. Hernandez subsequently expressed that the medication prescribed did not help and that he continued to feel suicidal.

8.    Despite Mr. Hernandez's ongoing complaints of suicidal ideation, on June 26, 2019, Defendants again *downgraded* Mr. Hernandez's care from the mental health observation unit to a General Population dormitory. This decision was made despite Mr. Hernandez's stated intent to kill himself if he were sent back to General Population. This decision was plainly contrary to accepted standard of psychiatric care, and contrary to Mr. Hernandez's requests as well as

recommendations of other DOCCS providers, inflicting unnecessary pain and suffering on Mr.

Hernandez and causing, contributing to, or precipitating his death.

9.      Less than 24 hours later, on June 27, 2019 at around 3:56 AM, Mr. Hernandez died

from asphyxiation from a ligature tied around his neck. He had used a bed sheet and a towel that

were given to him by Defendants, which he hung to his prison cell's clothes hook, the risk of which

was and should have been apparent to the Defendants from Mr. Hernandez's recent history, signs,

and symptoms.

10.      It was only through the deliberate indifference, recklessness, carelessness, gross

negligence, and negligence of DOCCS and/or New York State Office of Mental Health ("OMH")

personnel including Defendants, as well as abject systemic failures at DOCCS facilities, that Mr.

Hernandez's pleas for medical attention and psychiatric treatment were ignored during a critical

period. As a result, Mr. Hernandez, a 37-year-old man in good physical health, experienced

catastrophic pain and suffering and lost his life.

11.      Mr. Hernandez was survived by three biological children including Plaintiff Jose

L. Hernandez, Jr., A.H., and G.H.,[1] as well as his lawfully wedded wife, Liane Hernandez.

12.      On January 29, 2020, Surrogate's Court of the Suffolk County issued letters of

administration for Plaintiff Jose L. Hernandez, Jr. to prosecute this action on behalf of Mr.

Hernandez's estate, distributees, and next of kin as the sole Administrator.

13.      Therefore, Plaintiff brings this suit under 42 U.S.C. § 1983 for violations of

Decedent Mr. Hernandez's rights under the Eighth and Fourteenth Amendments to the United

States Constitution for Defendants' willful failure to provide, and Defendants' withholding of,

---

[1] As Mr. Hernandez's children except for Plaintiff Jose L. Hernandez is below 18 years of age, they will be referred to pseudonymously throughout this Complaint.

proper medical diagnosis, care, referral, and treatment with regard to Mr. Hernandez's psychiatric condition; as well as their willful withholding of adequate protection, supervision, and custodial care to prevent foreseeable harm to Mr. Hernandez. Plaintiff further brings this suit for negligence and professional malpractice in connection with the deficient medical, nursing, and psychiatric care provided to Mr. Hernandez by each of the Defendants.

14.    Plaintiff Jose L. Hernandez, Jr., as Administrator of the Estate of JOSE LUIS HERNANDEZ, Deceased, and on behalf of All Distributees and Next of Kin, seeks redress for Defendants' unconstitutional and otherwise unlawful conduct, which caused Decedent Mr. Hernandez to suffer catastrophic injuries, conscious pain and suffering, emotional distress, and wrongful death, causing injuries, losses, and damages to his distributees and next of kin including his three biological children and surviving spouse.

## JURISDICTION AND VENUE

15.    This Court has original jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a) as arising under the Constitution, laws, and/or treaties of the United States of America. Plaintiff's claims are predicated, in part, upon 42 U.S.C. § 1983, authorizing actions to redress deprivation of rights, privileges, and immunities secured by the Constitution and laws of the United States, and upon 42 U.S.C. § 1988, which authorizes the award of attorneys' fees and costs to prevailing plaintiffs in actions under 42 U.S.C. § 1983.

16.    Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 with respect to New York state law claims, as they are related to and form part of the same case or controversy as claims based on 42 U.S.C. § 1983.

17.    This Court has personal jurisdiction over the Defendants because the alleged incidents occurred within the confines of the State of New York.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

19.    Decedent Mr. Hernandez was a 37-year-old man who resided at a New York State prison known as Clinton Correctional Facility located at Dannemora, New York at the time of his death on June 27, 2019. At relevant times, Mr. Hernandez was incarcerated at several New York State prisons, including Clinton, Upstate, and Franklin Correctional Facilities.

20.    Plaintiff Jose L. Hernandez, Jr. is a biological son of Mr. Hernandez. He resides in the County of Suffolk, State of New York.

21.    At all times relevant hereto, Clinton, Upstate, and Franklin Correctional Facilities and their infirmaries were operated and maintained by the State of New York, acting through the DOCCS. DOCCS is responsible for providing habitation, care, custody, and supervision to incarcerated individuals held in correctional facilities throughout the State.

22.    At all times relevant hereto, New York State Office of Mental Health (hereinafter "OMH") contracted with DOCCS to provide psychiatric, psychological, and mental health care, diagnosis, evaluation, assessment, consultation, services, and treatment to inmates under DOCCS custody including Mr. Hernandez. The mental health service providers who provided, or purported to provide, medical care and treatment to Mr. Hernandez did so within their scope and capacities as agents, servants, employees, and/or contractors of OMH, and hence will be collectively referred to as "OMH Defendants" in this Complaint.

23.    At all times relevant hereto, Defendant J. WALDRON, U.C. (hereinafter "Defendant Waldron") was a medical and mental health care provider, and an agent, servant, employee, and/or contractor of OMH and/or DOCCS. Within the scope of her employment as

6

such, Defendant Waldron rendered or attempted to render care, treatment, and supervision to incarcerated persons in need of mental health and/or psychiatric services, including Mr. Hernandez. Defendant Waldron is sued in her official and individual capacities.

24.    At all times relevant hereto, Defendant "SOHAIL GILLANI, M.D." (hereinafter "Defendant Gillani") was a psychiatrist, clinician, and/or mental health care provider, and an agent, servant, employee, and/or contractor of OMH and/or DOCCS. Within the scope of his employment as such, Defendant Gillani rendered or attempted to render care, treatment, and supervision to incarcerated persons in need of mental health and/or psychiatric services, including Mr. Hernandez. Defendant Gillani is sued in his official and individual capacities.

25.    At all times relevant hereto, Defendant SHANNA BALL, R.N. (hereinafter "Defendant Ball") was a Registered Nurse and a mental health care provider, and an agent, servant, employee, and/or contractor of OMH and/or DOCCS. Within the scope of her employment as such, Defendant Ball rendered or attempted to render care, treatment, and supervision to incarcerated persons in need of mental health and/or psychiatric services, including Mr. Hernandez. Defendant Ball is sued in her official and individual capacities.

26.    Defendants Waldron, Gillani, Ball, and "JOHN AND JANE DOES 1-10" who were employed by OMH and were responsible for, participated in, and/or failed to intervene in mental health care, psychological examinations, identification of acute and chronic mental health conditions, design and implementation of care plans, provision of psychiatric or psychological counseling, and/or provision of emergency medical care to or for Mr. Hernandez at relevant times are hereinafter collectively referred to as "OMH Defendants."

27.    At all times relevant hereto, Defendant CORRECTIONAL OFFICER DERECK T. FLEMING (hereinafter "Defendant Fleming") was a Correctional Officer, and an agent, servant,

and employee of DOCCS. Within the scope of his employment as such, Defendant Fleming rendered or attempted to render custodial care, monitoring, and supervision to incarcerated persons in Clinton Correctional Facility, including Mr. Hernandez. Defendant Fleming is sued in his official and individual capacities.

28.    At all times relevant hereto, Defendant CORRECTIONAL OFFICER TRAVIS J. VIAU (hereinafter "Defendant Viau") was a Correctional Officer, and an agent, servant, and employee of DOCCS. Within the scope of his employment as such, Defendant Viau rendered or attempted to render custodial care, monitoring, and supervision to incarcerated persons in Clinton Correctional Facility, including Mr. Hernandez. Defendant Viau is sued in his official and individual capacities.

29.    Defendants Fleming, Viau, and "JOHN AND JANE DOES 1-10" who were employed by DOCCS, participated in providing custodial care to inmates incarcerated at Clinton Correctional Facility, and were responsible for provision of visual monitoring, security rounds, protection from foreseeable harm, and/or referral for emergency medical care to or for Mr. Hernandez at relevant times are hereinafter collectively referred to as "Clinton Officer Defendants."

30.    "John and Jane Doe 1 – 10," whose actual names are not known to Plaintiff despite reasonable efforts to obtain such information, and who are sued herein by the fictitious designation of "John and Jane Doe," were persons in charge of the custodial and/or medical care provided to Mr. Hernandez at relevant times. With regard to all relevant events, John and Jane Doe 1 – 10 were acting within the scope of their capacity as agents, servants, and employees of the OMH and/or DOCCS.

## JURY DEMAND

31.     Plaintiff hereby demands a trial by jury on all of his claims in this action.

## STATEMENT OF FACTS

32.     On or about June 14, 2018, Plaintiff's Decedent Jose Luis Hernandez, then 36 years of age, was placed under the care, custody, control, and supervision of the New York State Department of Corrections and Community Supervision (hereinafter "DOCCS") as a prisoner.

33.     Mr. Hernandez's conviction was for a criminal sale of controlled substance. The conviction carried a three-year sentence.

34.     From on or about June 14, 2018 until his death on June 27, 2019, Mr. Hernandez was continuously incarcerated under the custody of DOCCS. Therefore, he was continuously under the care, control, and supervision of the agents, servants, employees, and independent contractors of DOCCS and its various correctional facilities, including but not limited to the Defendants named herein.

35.     Defendants, as medical or custodial personnel of DOCCS, had the responsibility to maintain the safety, health, and well-being of inmates and to prevent inmates such as Mr. Hernandez from being subjected to undue harm and/or cruel and unusual punishment arising from denial of needed medical care.

36.     On or about June 14, 2018, Mr. Hernandez became initially incarcerated at Downstate Correctional Facility located in Fishkill, New York (hereinafter sometimes "Downstate"). Upon information and belief, Downstate Correctional Facility is an intake facility where inmates are temporarily housed and undergo admission screening including medical intake for permanent assignment to a correctional facility.

37.    At the time of performing Mr. Hernandez's medical intake, medical providers at Downstate had the responsibility to take an adequate history and account of Mr. Hernandez's physical and mental health, prior diagnoses, and treatments.

38.    During the admission screening at Downstate on or about June 14, 2018, Mr. Hernandez endorsed a history of engaging in outpatient mental health treatment for anxiety and depression in or prior to 2015.

39.    At this time, Mr. Hernandez denied a history of suicidal ideation, plan, or intent. The medical providers performing the medical intake confirmed that Mr. Hernandez did not have visible marks or scars of self-mutilation.

40.    On or about June 29, 2018, Mr. Hernandez was transferred to Franklin Correctional Facility located in Malone, New York (hereinafter sometimes "Franklin").

41.    During the admission screening on June 29, 2018 at Franklin, Mr. Hernandez endorsed a mental health history of anxiety, depression, and non-specific psychotic disorder. He described having been prescribed Zoloft and Risperdal in or prior to 2015 for these conditions.

42.    Upon information and belief, all charts and notes made by DOCCS and/or OMH personnel are logged onto a central database and made accessible and available to all other DOCCS and/or OMH personnel. Therefore, the named Defendants were aware and/or reasonably should have been aware of Mr. Hernandez's prior mental health history that was documented during these admission screenings, which elevated the risk that Mr. Hernandez would later suffer a mental health crisis.

43.    Mr. Hernandez adjusted to Franklin Correctional Facility and completed a semester of college. He was hopeful that the prison would serve a rehabilitative role for him and that he would be released early for good behavior and/or on merit.

44.     Mr. Hernandez shared with his family a grade report from North Country Community College dated March 29, 2019, which shows that he earned 12 credit hours toward entrepreneurship management degree with a 3.325 GPA with a 100% completion rate.

45.     Throughout his incarceration, Mr. Hernandez kept in close contact with his family and loved ones, including his three children and their two mothers, his wife, his sister, and his brother-in-law.

46.     In or around early May of 2019, Mr. Hernandez expressed to his family and relatives his concerns regarding gang-related incidents of cutting, slashing, and stabbing that were occurring pervasively at Franklin Correctional Facility. Mr. Hernandez felt a legitimate fear for his life, welfare, and safety.

47.     On or about May 27, 2019, Mr. Hernandez received a disciplinary ticket for being involved in a fight. Mr. Hernandez felt that he was "dragged into" the incident without a legitimate basis and felt frustrated that no DOCCS personnel appeared to care about his good behavior thus far. He felt utterly hopeless that no one around him appeared to care about him. Moreover, Mr. Hernandez was terrified that as a result of this disciplinary ticket, his sentence would be extended or his opportunity for early release would be lost irrevocably.

48.     Upon information and belief, said disciplinary ticket was in fact baseless and was later dropped and/or expunged in or around June 2019. However, until his death on June 27, 2019, Mr. Hernandez was never informed that the ticket was dropped. Defendants allowed Mr. Hernandez to continue to live in the fear that he would suffer disciplinary consequences from the ticket including increased prison time.

49.    After receiving the disciplinary ticket, Mr. Hernandez began to experience symptoms akin to panic attacks and a level of depression and helplessness that he had never experienced before, even when he was treated for anxiety and depression in or around 2015.

50.    Instead of providing mental health treatment, DOCCS decided to transfer Mr. Hernandez to a different correctional facility. On or about May 28, 2019, Mr. Hernandez was transferred to Upstate Correctional Facility located in Malone, New York (hereinafter sometimes "Upstate").

51.    Upstate Correctional Facility assigned Mr. Hernandez to a Special Housing Unit (hereinafter "SHU"), otherwise known to inmates as the "box," ostensibly to segregate him from other inmates. The resulting living arrangements and conditions were substantively identical to solitary confinement for disciplinary or punitive purposes.

52.    Mr. Hernandez stayed in the Upstate SHU without an ability to take a shower, brush his teeth, or correspond in any way with his loved ones. Mr. Hernandez's psychological condition worsened and he began to have thoughts of hurting himself.

53.    Upon information and belief, Mr. Hernandez was one of many inmates who were transferred from Franklin Correctional Facility to Upstate Correctional Facility as a result of widespread and large-scale gang activity at Franklin. As a result, correctional officers and/or medical officers at Upstate were incapable of providing adequate care to inmates in a mental health crisis such as Mr. Hernandez and, to the extent that they were capable of doing so, they deliberately disregarded the need to provide such care in a timely manner.

54.    On or about May 28, 2019, Mr. Hernandez attempted to hang himself with a towel, lost consciousness, defecated, woke up, and cleaned himself up.

55.    Mr. Hernandez expressed to the correctional officers and/or medical officers at Upstate Correctional Facility that he felt suicidal. He candidly explained his psychological condition and requested "mental medications" to be prescribed by a physician.

56.    An Ambulatory Health Record Progress Note dated May 28, 2019 states that Mr. Hernandez presented to Upstate infirmary after submitting a sick call slip stating "I'm feeling suicidal." An infirmary nurse, whose identity is unknown at this time but who was acting in her capacity as DOCCS's agent, servant, and/or employee, recommended that Mr. Hernandez be immediately placed on "OMH 1:1 watch" by mental health providers employed by OMH. This Nurse will be referred to as "Nurse A" in the rest of this Complaint.

57.    Upon information and belief, "1:1 watch" consists of constant, uninterrupted, one-on-one visual monitoring by OMH personnel of an inmate who poses a suicide risk. For an inmate who attempted suicide and exhibits ongoing signs of suicidality, DOCCS and OMH personnel are required by DOCCS protocol not to leave the inmate unattended at any time, highlighting the need for one-on-one watch. *See*, *e.g.*, DOCCS Protocol No. 4101 (Inmate Suicide Prevention).

58.    DOCCS's own Protocols including No. 4101 (Inmate Suicide Prevention) require that whenever there is a reason to suspect that an inmate "is at imminent risk of self-harm," that inmate must "be assessed immediately and/or placed on a Suicide Watch" and must not be left unattended at any time.

59.    By definition, the Suicide Watch is meant to "consist of direct, constant visual observations of the inmate by a Correction Officer of the same gender as the inmate … Any inmate on a Suicide Watch must be under constant visual observation." *See* DOCCS Protocol No. 4101 (Inmate Suicide Prevention).

60.     Nurse A recommended that Mr. Hernandez be admitted to Upstate's infirmary so he could be placed on constant one-on-one Suicide Watch by OMH. Mr. Hernandez also agreed that he wanted to receive OMH services.

61.     As a result, on or about May 29, 2019, Mr. Hernandez was placed under the care, treatment, and supervision of the OMH Defendants as mental health providers.

62.     On or about May 29, 2019, OMH Defendants conducted an initial interview of Mr. Hernandez and reviewed his mental health history to designate proper service level. Upon information and belief, Defendant J. Waldron, U.C. was the OMH provider who came to see Mr. Hernandez in person for OMH admission screening.

63.     Despite the acuteness and severity of Mr. Hernandez's condition, OMH Defendants including Defendant Waldron failed to provide proper psychiatric or psychological evaluation, testing, assessment, counseling, and/or treatment as to his condition.

64.     Defendant Waldron acknowledged that Mr. Hernandez was "feeling suicidal … [states] don't want to live anymore … suffer from anxiety and depression and need meds." OMH records reveal that Defendant Waldron was also subjectively aware of Mr. Hernandez's prior history of anxiety, depression, and psychotic disorder. Mr. Hernandez also directly reported to Defendant Waldron that "he attempted to hang up with a towel in his cell" on or around May 28.

65.     Defendant Waldron did not question Mr. Hernandez in detail about his suicide attempt. In fact, no investigation was held by either OMH or DOCCS to examine the towel that Mr. Hernandez claimed to have used in his suicide attempt or his prison cell to ensure that similar incident would not occur in the future.

66.     Defendant Waldron's notes with respect to her examinations are perfunctory and contradictory, as evidenced by her conclusion that Mr. Hernandez did not require OMH Level 1

(highest out of 6) care, which she knew is appropriate when an inmate "Engaged in verified serious suicide attempt … within past 1 year." Mr. Hernandez's signs, symptoms, history, and complaints clearly qualified him for Level 1 care.

67.     Defendant Waldron only upgraded Mr. Hernandez's mental health designation from Level 6 (Grossly Normal; No assigned staff from the Office of Mental Health) to *Level 4* (OMH staff is assigned on a part-time basis and able to provide treatment to inmate-patients who *may require limited intervention, excluding psychiatric medications*) (emphasis added).

68.     Defendant Waldron knew or should have known that Level 4 services were clearly and grossly inadequate for Mr. Hernandez's signs, symptoms, condition, and complaints of suicidal ideation and suicide attempt.

69.     According to Defendant Waldron's chart, Level 4 designation means that the inmate "May benefit from brief psychotherapy – does not have Serious Mental Illness ("SMI") diagnosis." By designating Mr. Hernandez as OMH Level 4, Defendant Waldron effectively and actually discharged Mr. Hernandez from one-on-one Suicide Watch that had been recommended by Nurse A.

70.     Defendant Waldron made this determination by herself, without consulting, or referring Mr. Hernandez to, a psychiatrist or a physician to make a proper determination regarding his mental health treatment plan.

71.     Upon information and belief, OMH Defendants including Defendant Waldron had access to all charts and notes made by other DOCCS and/or OMH personnel including those by Nurse A, and therefore were aware or reasonably should have been aware of Mr. Hernandez's need for Suicide Watch.

72.     OMH Defendants including Defendant Waldron knew or should have known about Mr. Hernandez's history of suicide attempt including on or around May 28, 2019 as well as his prior medical history of anxiety and depression. These facts would and should have indicated to a reasonable mental health provider that Mr. Hernandez posed an active risk of suicide and therefore must be provided with the maximum level of psychiatric care available, including inpatient level of psychiatric treatment and/or constant one-on-one Suicide Watch.

73.     On or around May 29, 2019, Defendant Waldron released Mr. Hernandez from one-on-one Suicide Watch and instead ordered continued treatment with OMH Defendants on an outpatient basis only, at a "Day clinic" located in Clinton Correctional Facility. In doing so, Defendant Waldron recklessly disregarded Mr. Hernandez's serious medical condition and his verbal pleas for higher level of psychiatric treatment including consultation with a psychiatrist and prescription of medications.

74.     Defendant Waldron could have recommended inpatient level of psychiatric care for Mr. Hernandez and/or maintained him on Suicide Watch that began on or around May 28, 2019, as was in fact mandated by DOCCS protocols. Defendant Waldron knew about the risk of excessive harm that was posed to Mr. Hernandez by her failure to make these recommendations. Nevertheless, Defendant Waldron deliberately disregarded such risk without so much as consulting a psychiatrist despite Mr. Hernandez's verbal requests to be seen by a psychiatrist.

75.     For the next 30 days leading up to Mr. Hernandez's death on June 27, 2019, OMH Defendants never placed Mr. Hernandez back on one-on-one Suicide Watch, in reckless disregard of Mr. Hernandez's deteriorating condition as well as recommendations of other DOCCS and/or OMH personnel including but not limited to Nurse A.

76.     On or around May 30, 2019, Mr. Hernandez was transferred from Upstate SHU to Clinton Correctional Facility located in Dannemora, New York (hereinafter sometimes "Clinton").

77.     From May 30, 2019 up to his death on June 27, 2019, Mr. Hernandez was continuously incarcerated in Clinton and received the care, treatment, and supervision of Clinton's correctional officers including the Clinton Officer Defendants as well as OMH providers including the OMH Defendants.

78.     Throughout his time at Clinton, Mr. Hernandez continued to present to DOCCS and OMH personnel including the named Defendants, pleading for adequate medical treatment for his deteriorating, progressive, and extremely serious psychiatric condition. Astonishingly, Defendants never transferred Mr. Hernandez to an outside medical facility or put him on one-on-one Suicide Watch, as was mandated by DOCCS protocols as well as applicable standard of care.

79.     At the time of his admission screening at Clinton Correctional Facility on May 30, 2019, Mr. Hernandez was seen by a Nurse at Clinton's infirmary who noted that he presented with "SI [suicidal intent] & a plan, anxious, depressed." This Nurse, whose identity is unknown at this time but who was acting as DOCCS's agent, servant, and/or employee, will be referred to as "Nurse B" in the rest of this Complaint.

80.     Nurse B acknowledged Mr. Hernandez's suicide attempt that occurred on or around May 28, 2019. Specifically, Nurse B noticed that Mr. Hernandez's right eye and eyelid were visibly red, which Mr. Hernandez explained were from the lack of oxygen he suffered when he tried to hang himself. Defendant Waldron, who had examined Mr. Hernandez the previous day, had disregarded this visible physical sign and omitted it from her progress note.

81.     Nurse B recommended that Mr. Hernandez be evaluated by OMH immediately due to "Threat of self harm."

82.     The assigned OMH provider, who upon information and belief was a registered nurse with last name Blair, examined Mr. Hernandez in the morning of May 30, 2019 to determine appropriate level of mental health services.

83.     Nurse Blair noted that Mr. Hernandez presented with current suicidal ideation as well as a history of self-mutilation. Nurse Blair recommended that Mr. Hernandez be immediately admitted to Clinton's mental health unit for one-on-one Suicide Watch.

84.     Between 10am and noon on May 30, 2019, Mr. Hernandez was briefly placed on one-on-one Suicide Watch. At around noon, OMH Defendants decided to release Mr. Hernandez from Suicide Watch and instead placed him in Residential Criss Treatment Program ("RCTP"), which is a mental health observation unit within Clinton Correctional Facility where Correctional Officers are mandated to perform security rounds with 15-minute interval and nurses (either from OMH or DOCCS) perform daily nursing assessments for the purpose of suicide prevention.

85.     According to DOCCS's Protocols including No. 4308, the goal of the RCTP is to evaluate and treat inmate-patients in need of "short-term" crisis mental health care. RCTPs have both observation cells and a dorm area for inmate-patients in crisis and in need of intensive treatment and monitoring.

86.     This level of care was inadequate for Mr. Hernandez. At this point, Mr. Hernandez had still not been examined or seen by a psychiatrist, even though he continued to endorse ongoing suicidal ideation and need for psychiatric medications. Mr. Hernandez should have been transferred to a higher hospital level of inpatient care and remained on one-on-one Suicide Watch by qualified mental health professionals.

87.     Throughout his time at RCTP, when OMH providers came for daily cell-side interviews, Mr. Hernandez continued to endorse symptoms of depression, anxiety, and suicidal ideation and requested an opportunity to "speak with a psychiatrist soon about medication."

88.     For example, B. Waite, LMSW 2, examined Mr. Hernandez in RCTP on May 31, 2019 and again on June 3, 2019, and noted that Mr. Hernandez presented "warning signs of imminent suicide risk." At a minimum, these warning signs should have elevated Mr. Hernandez's care to OMH mental health designation of Level 1 under which full-time mental health care is made available. The array of available specialized services for Level 1 patients include commitment to the Central New York Psychiatric Center or other such psychiatric hospitalization that allows for full-time Suicide Watch.

89.     B. Waite, LMSW 2 recommended on June 3, 2019 that Mr. Hernandez remain at RCTP and be followed by OMH providers in RCTP.

90.     Despite having access to these records, on June 3, 2019, Defendant Sohail Gillani, M.D. made an inexplicable and reckless decision to discharge Mr. Hernandez from RCTP mental health observation unit and placed him off of observation status completely. This decision was contrary to Mr. Hernandez's signs, symptoms, history, and complaints and the recommendations by other DOCCS and/or OMH providers including Nurse A, Nurse Blair, and B. Waite, LMSW 2.

91.     Defendant Gillani discharged Mr. Hernandez to a General Population dormitory at Clinton where she knew he would receive grossly inadequate level of mental health services.

92.     Subsequently, Mr. Hernandez's mental health condition deteriorated with rapidity.

93.     On or around June 3, 2019, OMH upgraded Mr. Hernandez's mental health designation from Level 4 to Level 2. Level 2 mental health services are defined as OMH staff being assigned on a full-time basis and able to provide treatment to inmate-patients with a major

mental disorder, but that such disorder is not as acute as that of inmate-patients who require Level 1 services.

94.     Despite his mental health service level in theory being upgraded to Level 2, in reality, Mr. Hernandez remained incarcerated in a General Population dormitory in D-3 company, receiving only outpatient service from Clinton's RCTP day clinic once a day.

95.     Defendants and other OMH and/or DOCCS personnel continued to ignore that Mr. Hernandez's history, signs, symptoms, and complaints warranted immediate placement on Suicide Watch and/or psychiatric hospitalization as required by the DOCCS protocols.

96.     The condition at Clinton Correctional Facility further exacerbated the depression, anxiety, suicidality, and emotional distress that Mr. Hernandez was experiencing. Specifically, in June 2019, Clinton Correctional Facility was placed on facility-wide lock-down because of violent riots and inmate uprising that were rampant throughout the Facility.

97.     What this lock-down in effect meant for Mr. Hernandez was that he was confined to his solitary prison cell during all hours in the same condition as if he were sent to SHU or the "box" for disciplinary reasons.

98.     For example, Mr. Hernandez was not given an ability to take a shower or brush his teeth. He was not given his personal belongings from Franklin Correctional Facility or basic personal items such as deodorant or a pillow. He still did not have an ability to call his family and was also not allowed to buy stamps to send mail. After Mr. Hernandez passed away, the family went to the prison to pick up his personal effects, which included letters that he had written to them that he was never allowed to mail out.

99.     Mr. Hernandez felt an abject sense of hopelessness at the continued lock-down and hostile environment. He expressed increasing symptoms of depression and suicidality to Clinton and/or OMH personnel including the named Defendants to no avail.

100.     Upon information and belief, Defendants had access to each other's charts and notes, and therefore were aware or reasonably should have been aware of Mr. Hernandez's acutely deteriorating condition that was documented by other providers within DOCCS and/or OMH.

101.     On or about June 17, 2019, Mr. Hernandez was issued a disciplinary ticket for misbehavior when he was found to have had a razor in his cell by Correctional Officer J. S. Baker.

102.     This ticket was inexplicably dismissed at a Tier 3 hearing on June 20, 2019. Instead of interviewing Mr. Hernandez or investigating the incident properly, the Hearing Officer merely stated that it is not the policy of DOCCS to allow inmates to possess a razor and therefore there was no reason to believe that Mr. Hernandez had a razor.

103.     This conclusion contradicted and disregarded C.O. Baker's personal observation that Mr. Hernandez in fact held a razor in his cell.

104.     Due to the facility-wide lockdown and gang riots that were occurring at the time, correctional officers and/or medical officers at Clinton were incapable of providing adequate care to inmates in a mental health crisis such as Mr. Hernandez and, to the extent that they were capable of doing so, they deliberately disregarded the need to provide such care in a timely manner. Upon information and belief, this is the reason that Defendants disregarded credible evidence that Mr. Hernandez possessed a razor.

105.     Mr. Hernandez was allowed access to a sharp object as indicated by the fact that he had several horizontal scars on his bilateral anterior wrists at time of his death as stated in the autopsy report.

106.    Defendants were clearly aware of Mr. Hernandez's deteriorating and serious mental health condition including but not limited to recurrent and obvious suicidal ideation and attempts. Nevertheless, Mr. Hernandez remained under lockdown in General Population, receiving minimal mental health treatment on an outpatient basis once a day, which did not include examinations by a psychiatrist or prescription of mental health medications.

107.    It is extraordinary and inexplicable that Mr. Hernandez continued to be denied proper psychiatric treatment, was not placed on constant Suicide Watch, and was not transferred to a hospital for monitoring, evaluation, and treatment.

108.    On June 22, 2019, at around 1:10 AM, Mr. Hernandez presented to Clinton Correctional Facility's internal emergency room and was examined by Laranh Wyler, R.N.

109.    On her progress note, Nurse Wyler wrote that Mr. Hernandez stated that he wanted to "hang himself" as he "just want to die. … something wrong in my head (mentally I'm not stable). … Depressed Anxious (I feel like my heart jump out of my chest!)." Mr. Hernandez also stated to Nurse Wyler: "I am so worry / anxious all times. Anxiety, slept all days / night. … and so depressed I might as well die!!"

110.    Nurse Wyler noted "SI [suicidal intent] & plan 'hanging'!" and also noted her concern that Mr. Hernandez was not on any mental health medications.

111.    Nurse Wyler referred Mr. Hernandez for an examination by OMH and inpatient level of observation. Mr. Hernandez reportedly "agree[d] for adm[ission] … stated feel safer," indicating that he wished to receive inpatient level of psychiatric care and treatment.

112.    At around 6:00 AM, an OMH provider, who upon information and belief was Defendant Shanna Ball, R.N., saw Mr. Hernandez and acknowledged that Mr. Hernandez "had thoughts of harming himself" and "reports feeling constantly down and depressed."

113.   Defendant Ball failed to provide proper psychiatric or psychological evaluation, testing, assessment, counseling, and/or treatment as to Mr. Hernandez's condition.

114.   Defendant Ball wrote perfunctory and contradictory notes. Despite having access to the previous notes by other DOCCS and/or OMH providers including Nurse Wyler, Defendant Ball made a patently incorrect documentation that Mr. Hernandez denies suicidal ideation, history of suicide attempts, and history of self-mutilation.

115.   Defendant Ball deliberately disregarded Mr. Hernandez's serious signs, symptoms, and complaints of suicidality and kept his mental health designation at Level 2. This meant that Mr. Hernandez was put under observation in RCTP within Clinton Correctional Facility, where security rounds would be performed with 15-minute intervals and nursing assessments would be performed on a daily basis. This level of care was clearly and grossly inadequate for Mr. Hernandez, who posed an active and acute risk of suicide that was known to the Defendants.

116.   Mr. Hernandez's continuing suicidal ideation as well as his history, signs, and complaints warranted a substantially higher level of care and treatment than what can be provided under Level 2. Defendant Ball recklessly disregarded the need to refer Mr. Hernandez for psychiatric hospitalization and/or to place him on 24-hour Suicide Watch and made a callous and inexplicable determination that he did not require the same.

117.   Defendant Ball as a Registered Nurse made this determination by herself, without consulting, or referring Mr. Hernandez to, a psychiatrist or a physician to make a proper determination regarding his mental health treatment plan. Defendant Ball also disregarded Mr. Hernandez's requests for proper psychiatric assessment and medications, which upon information and belief could only be provided by a qualified psychiatrist.

118.    At a minimum, Defendant Ball should have sought consultation of a psychiatrist before ruling out ongoing suicidal ideation and intent, which determination was made contrary to all available evidence.

119.    Defendant Ball disregarded Mr. Hernandez's obvious and deteriorating mental health condition. Mr. Hernandez's progressive and recurrent symptoms of suicidality would and should have alerted a reasonable medical provider to immediately seek consultation of a psychiatrist, and to provide him with a higher level of psychiatric care including hospital level of care as an inpatient and/or constant one-on-one Suicide Watch.

120.    Defendant Ball recklessly disregarded Mr. Hernandez's serious medical condition and his verbal pleas for higher level of psychiatric treatment including prescription of medications. Defendant Ball had an opportunity to recommend or order hospitalization of Mr. Hernandez for inpatient psychiatric care or commitment to one-on-one Suicide Watch, as was required by the standard of care and by DOCCS's Protocols. Defendant Ball knew the risk of excessive harm that was posed to Mr. Hernandez by her failure to make these recommendations.

121.    Nevertheless, Defendant Ball made a unilateral decision to assign Mr. Hernandez to RCTP, the mental health treatment program within Clinton Correctional Facility as was described above.

122.    From June 22, 2019 through June 26, 2019, while housed in RCTP unit, Mr. Hernandez voiced acutely increasing levels of constant suicidal ideation.

123.    From June 22, 2019 through June 26, 2019, OMH and/or DOCCS personnel including Defendants disregarded the need to perform adequate and accurate psychiatric evaluation of Mr. Hernandez, to place him on 24-hour one-on-one Suicide Watch, and/or to transfer him to a higher hospital level of psychiatric care.

124.    During this crucial time period, the individual Defendants and other personnel at Clinton and/or OMH, including the John and Jane Doe Defendants, did not take basic, medically-necessary steps to protect Mr. Hernandez's life and welfare, including but not limited to one-on-one Suicide Watch and/or commitment for inpatient psychiatric care.

125.    On June 24, 2019, OMH personnel J. Fortin, M.A. conducted a suicide risk assessment by interviewing Mr. Hernandez cell side.

126.    Mr. Hernandez stated to Mr. Fortin that he was fearful about the repercussions of disciplinary sanctions he had received, upon information and belief referring to the baseless disciplinary ticket he had received on or around May 27, 2019. Mr. Hernandez expressed that he was afraid of other inmates and correctional staff associating him with gang violence. As a result, Mr. Hernandez was generally terrified of the prospect of returning to General Population and of having to share his mental health concerns with Clinton's correctional and/or security staff. He also reiterated that he needed psychiatric medications.

127.    J. Fortin, M.A. acknowledged that Mr. Hernandez presented multiple warning signs of "imminent suicide risk." As to the treatment plan including whether to prescribe psychiatric medications to Mr. Hernandez, J. Fortin, M.A. deferred the decision to Defendant Sohail Gillani, M.D. as a clinician.

128.    On June 24, 2019, Defendant Gillani interviewed Mr. Hernandez who stated that he "will kill self if goes back to GP." Mr. Hernandez wanted to remain in special housing or protective custody. On this day, for the first time, Mr. Hernandez was prescribed an antidepressant medication by Defendant Gillani.

129.    Defendant Gillani failed to provide proper psychiatric or psychological evaluation, testing, assessment, counseling, and/or treatment as to Mr. Hernandez's condition.

130.    Despite having access to the previous notes by other DOCCS and/or OMH providers including Nurse Wyler and Mr. Fortin, Defendant Gillani deliberately disregarded that Mr. Hernandez had a history of self-harm and suicidal ideation, as shown by the fact that she failed to check off these boxes in her progress note. She assumed that Mr. Hernandez had an "agenda" to not return to General Population.

131.    Defendant Gillani made the determination to keep Mr. Hernandez in RCTP for short-term observation only. By doing so, Defendant Gillani disregarded Mr. Hernandez's serious medical condition that warranted immediate psychiatric hospitalization and constant one-on-one Suicide Watch, as was mandated by DOCCS protocols and the applicable standard of care. Defendant Gillani knew the risk of excessive harm that was posed to Mr. Hernandez by his failure to make these recommendations.

132.    On June 25, 2019, OMH personnel J. Fortin, M.A. conducted another suicide risk assessment by interviewing Mr. Hernandez. Mr. Fortin again noted that Mr. Hernandez was fearful, anxious, and suicidal, and presented "warning signs of imminent suicide risk."

133.    Mr. Fortin recommended that Mr. Hernandez remain admitted at RCTP under observation for "safety and stability" and that "Patient is reluctant to be discharged from RCTP."

134.    On June 26, 2019, Mr. Hernandez was interviewed by a social worker employed by OMH. Mr. Hernandez expressed to this social worker that he "was started on medications two days ago and doesn't feel like it has been helping." He specifically reported that he was "feeling the same, I have thoughts of wanting to hurt myself."

135.    Contrary to all evidence that Mr. Hernandez's condition of crisis did not resolve, and contrary to the recommendation of other treatment providers including Mr. Fortin, OMH Defendants made an inexplicable decision to *discharge* Mr. Hernandez from RCTP observation

unit on June 26, 2019 – less than 24 hours before he committed suicide in a General Population cell.

136.   Defendant Gillani interviewed Mr. Hernandez on June 26, 2019 and made a callous and reckless determination that Mr. Hernandez could be returned to Clinton's General Population. This was despite Defendant Gillani's own notes that Mr. Hernandez "will kill self if [he] goes back to GP."

137.   Defendant Gillani again disregarded that Mr. Hernandez had a history of self-harm and suicidal ideation. She did not check off these boxes in her progress note dated June 26, 2019.

138.   From having access to the previous notes by other DOCCS and/or OMH providers, Defendant Gillani knew that the psychiatric medications prescribed two days ago had been ineffective. Defendant Gillani also knew that other providers including Mr. Fortin had recommended Mr. Hernandez's continued admission and observation at RCTP mental health unit.

139.   Defendant Gillani knew about and recklessly disregarded Mr. Hernandez's ongoing suicidal ideation that was not resolved by prescribed medications, which should have triggered immediate further work-up and referral for a hospital level of care and/or one-on-one Suicide Watch.

140.   Far from elevating the level of care Mr. Hernandez was receiving, Defendant Gillani made a reckless decision to discharge Mr. Hernandez from mental health observation at RCTP back to General Population. Defendant Gillani knew that Mr. Hernandez would be placed at an excessive risk of irreparable harm by being discharged to General Population, as exemplified by Mr. Hernandez's statement to the OMH Defendants that he *will* kill himself if he is sent back to General Population.

141.    At around 10:15 AM on June 26, 2019, Mr. Hernandez was discharged to Clinton's General Population. It should have been foreseeable to each individual Defendant that Mr. Hernandez was at a significant risk of committing or attempting suicide and therefore required constant monitoring.

142.    Upon his release from RCTP, Mr. Hernandez became housed in a solitary cell in D-2 General Population dormitory, which is not constantly monitored by OMH personnel. His custodial care and supervision, especially during non-business-hours, was to be provided by correctional officers without adequate mental health expertise or training, including the Clinton Officer Defendants.

143.    Again, the solitary confinement coupled with ongoing facility-wide lock-down at Clinton effectively served as punitive and disciplinary segregation. Mr. Hernandez's requests to make calls and/or correspond with his family and friends were ignored and denied.

144.    According to the records, the last time that Mr. Hernandez was seen alive was at 2:00 AM on June 27, 2019 when Defendant Correctional Officer Dereck T. Fleming conducted a security round. Defendant Fleming either failed to notice Mr. Hernandez's visible signs of distress and suicidality or, in the alternative, did notice the same but recklessly disregarded its significance.

145.    It was at around 2:57 AM when Mr. Hernandez was found dead. While conducting a security round, Defendant Correctional Officer Travis J. Viau found Mr. Hernandez hanging from the clothes hook on the prison cell wall, with a bed sheet and a towel wrapped around his neck.

146.    This shows that Defendants left Mr. Hernandez unattended for about an hour, between 2:00 AM and 2:57 AM, contrary to DOCCS's own protocols against leaving suicidal inmates unattended at any time including non-business-hours.

147.    Upon information and belief, Defendants Officer Fleming and Officer Viau were in charge of rendering proper custodial care, supervision, and monitoring to Mr. Hernandez by performing rounds with at most 30-minute interval.

148.    Clinton Officer Defendants failed to perform security rounds with the requisite frequency.

149.    In violation of DOCCS protocols, Clinton Officer Defendants left Mr. Hernandez unsupervised for an hour. Moreover, Defendants allowed Mr. Hernandez access to a ligature that he could foreseeably use to hang himself, including a blanket and a towel. Mr. Hernandez was a well-known suicide risk and had a history of suicidal ideation documented by OMH Defendants where he had specifically referenced suicide by hanging.

150.    Defendants knew or should have known that even the rounds with 30-minute interval would have been grossly inadequate and indifferent to the severity and acuteness of Mr. Hernandez's condition. DOCCS's own protocols as well as the applicable standard of psychiatric care indicate that Mr. Hernandez should have received full and adequate psychiatric assessments, taken to a psychiatric hospital or other inpatient setting, and remained on constant one-on-one Suicide Watch until his symptoms were alleviated.

151.    While conducting security rounds, Clinton Officer Defendants failed to acknowledge, assess, or address Mr. Hernandez's condition especially in light of his ongoing suicidal ideation that had been documented by OMH Defendants.

152.    At around 3:05 AM, correctional officers as well as a nurse were called to the scene and started CPR. They made a request for an ambulance.

153.    At around 3:30 AM, EMS arrived and continued CPR, but Mr. Hernandez remained unresponsive.

154.    At 3:56 AM, a physician from Champlain Valley Physicians Hospital pronounced Mr. Hernandez dead.

155.    In summary, from on or around May 28, 2019 through June 27, 2019, Mr. Hernandez's symptoms required immediate medical attention, diagnostic testing, assessment, treatment, referral, hospitalization, and constant monitoring, which the Defendants were deliberately indifferent to and consequently refused to provide the required care. This includes but is not limited to Defendants' repeated refusals to follow other DOCCS personnel's recommendations to place Mr. Hernandez under mental health observation and/or Suicide Watch, which Defendants were able to provide and were mandated by DOCCS protocols to provide.

156.    Defendants discharged Mr. Hernandez from one-on-one Suicide Watch on or around May 30, 2019 and kept him in solitary confinement in General Population dormitory for most of the next month until Mr. Hernandez's death on June 27, 2019. Defendants knew and consciously disregarded Mr. Hernandez's requests to remain under psychiatrist's care and treatment, and his stated intent to kill himself if he were to be sent to General Population.

157.    Even though other DOCCS personnel had recommended and placed Mr. Hernandez on observation within Clinton's RCTP mental health unit from May 30, 2019 through June 3, 2019 and again from June 22, 2019 through June 26, 2019, Defendants made a callous, reckless, and deliberately indifferent determination to discharge Mr. Hernandez back to a prison cell with inadequate monitoring and mental health treatment, which caused, contributed to, and/or precipitated Mr. Hernandez's death on June 27, 2019.

158.    Defendants were not only negligent, grossly negligent, and reckless, but they were deliberately indifferent to Mr. Hernandez's health and safety by disregarding his recurrent and progressively worsening signs, symptoms, and conditions, and complaints conveyed to medical

officers of DOCCS and/or OMH including the named Defendants. Mr. Hernandez made specific verbal pleas for psychiatric treatment including mental health medications and examinations by a qualified psychiatrist, which were repeatedly denied and ignored.

159.   Each of the Defendants knew and disregarded that Mr. Hernandez's suicidal tendencies were far from being alleviated and in fact were rapidly increasing in intensity and frequency. Defendants knew or should have known that Mr. Hernandez required an immediate transfer to a hospital and/or other psychiatric inpatient setting for proper diagnosis, assessment, treatment, and management, which pursuits would have diagnosed Mr. Hernandez's serious medical condition that required ongoing treatment and constant monitoring.

160.   The Eighth Amendment to the Constitution of the United States of America prohibits the infliction of "cruel and unusual punishments" on those arrested and awaiting trial or those convicted of crimes, including punishments that "involve the unnecessary and wanton infliction of pain."

161.   Defendants' willful withholding of proper psychiatric, medical, and nursing diagnosis, care, and treatment with regard to Mr. Hernandez's suicidal ideation during a critical period caused him to suffer cruel and unusual treatment, catastrophic pain and suffering, and wrongful death.

162.   During relevant times, Defendants were adequately informed of Mr. Hernandez's condition and his need for psychiatric treatment and medications, and knew that his condition was serious and progressive.

163.   From May 28, 2019 through June 27, 2019, Mr. Hernandez pleaded for medical attention and treatment for his medical condition and explicitly requested to be admitted under a

psychiatrist's care several times. Defendants failed and refused to provide Mr. Hernandez with the medical care and treatment he urgently needed and pleaded for.

164.    Defendants knew or should have known that Mr. Hernandez had developed a medical emergency that could cause catastrophic and irreversible outcome unless promptly diagnosed, treated, and monitored.

165.    Yet Defendants denied Mr. Hernandez proper care and treatment. In doing so, Defendants ignored their own and other providers' medical notes, examinations, and orders with regard to Mr. Hernandez's medical care.

166.    Defendants knew and consciously disregarded that a patient with persistent, severe, and worsening suicidal ideation not resolved with medication is in need of urgent psychiatric intervention, evaluation, testing, diagnosis, treatment, and monitoring, and that unless he timely receives said medical care, he is subject to an imminent risk of severe and permanent injury or death.

167.    Defendants displayed deliberate indifference toward providing necessary and clearly indicated treatment. Defendants failed and refused to take a detailed psychological assessment, order examination or consultation by a qualified physician, or refer Mr. Hernandez for external medical trip and/or constant Suicide Watch.

168.    Defendants knew and consciously disregarded that they did not have a cognizable explanation or a reasonable treatment plan with regard to Mr. Hernandez's deteriorating condition.

169.    Defendants also knew and consciously disregarded that timely and proper medical intervention such as psychiatric hospitalization could reduce the risk to Mr. Hernandez's health and prevent the unnecessary and wanton infliction of prolonged pain and suffering.

170.     Defendants' deliberate indifference prolonged Mr. Hernandez's pain and suffering and caused, contributed to, and/or precipitated his untimely death on June 27, 2019.

171.     Defendants are individuals with final policy-making authority, whose decisions contributed to OMH and/or Clinton Correctional facility's policy, practice, or custom of deliberate indifference to the medical and psychological wellbeing of prisoners, including Mr. Hernandez.

172.     Defendants had the ability to change said policy, practice, or custom but through deliberate indifference did not do so, although understanding that there existed an excessive risk or serious harm to inmates' safety and health.

173.     Defendants had an absolute non-delegable duty to ensure that prisoners in their custody receive adequate medical treatment. Defendants were negligent, grossly negligent, careless, reckless, and deliberately indifferent in the care and treatment that was rendered to Mr. Hernandez.

174.     Defendants' acts and omissions in failing to provide Mr. Hernandez access to proper treatment for his serious medical condition were so far below acceptable standards of care that Defendants could not truly have been making medical judgments.

175.     Defendants' acts and omissions in failing to provide custodial care, monitoring, or supervision to ensure that he would not have access to materials that he could use to foreseeably harm or kill himself were reckless, callous, and deliberately indifferent to Mr. Hernandez's safety, health, and welfare.

176.     Mr. Hernandez's injuries were a direct result of Defendants' deliberate indifference to Mr. Hernandez's health and safety, Defendants' disregard of the excessive risk of harm to Mr. Hernandez's health and safety, and/or Defendants' negligent failure to provide adequate medical care and treatment to Mr. Hernandez.

177.    As a result of the foregoing, Mr. Hernandez suffered catastrophic and permanent injuries including but not limited to wrongful death, loss of years of life, loss of substantial opportunity for cure and better outcome, pain and suffering, emotional distress, and future loss of income.

178.    As a result of the foregoing, Plaintiff Jose L. Hernandez, Jr., as duly appointed Administrator of the Mr. Hernandez's estate, and on behalf of All Distributees and Next of Kin, seeks redress for Defendants' unconstitutional and otherwise unlawful conduct, which caused Decedent Mr. Hernandez to suffer catastrophic injuries, loss of years of life, loss of substantial opportunity for cure and better outcome, conscious pain and suffering, agony, emotional distress, future loss of income, and fear of impending death, as well as wrongful death, which caused injuries, losses, and damages to Mr. Hernandez's distributees and next of kin including his three biological children and surviving spouse.

**FIRST CAUSE OF ACTION**
**(Deliberate Indifference to Serious Medical Need under 42 U.S.C. § 1983)**
**(Against All Defendants)**

179.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

180.    At all relevant times, each individual Defendant was acting in their individual and official capacities, under color of State law.

181.    Defendants violated the Eighth and Fourteenth Amendments to the United States Constitution, prohibiting the infliction of "cruel and unusual punishments" on those convicted of crimes, including punishments that "involve the unnecessary and wanton infliction of pain." It is well established that deliberate indifference in providing indicated and necessary medical care to

inmates can constitute the unnecessary and wanton infliction of pain prohibited by the Eighth and Fourteenth Amendments.

182.    Defendants, acting under the color of State law, knew but consciously disregarded the substantial and excessive risk of harm to Mr. Hernandez's health and safety that resulted from their failure to provide Mr. Hernandez with adequate mental health care or access to mental health care during a critical period.

183.    Defendants, acting under the color of State law, consciously disregarded Mr. Mr. Hernandez's serious medical needs, which warranted an immediate testing, evaluation, and assessment by a physician and a referral for a higher hospital level of care.

184.    Furthermore, Defendants deliberately and actively created a living environment where Mr. Hernandez's mental health would foreseeably deteriorate including by denying him privileges to call or write to his loved ones.

185.    Defendants' deliberate indifference to Mr. Hernandez's known serious medical needs violated Mr. Hernandez's Eighth and Fourteenth Amendment rights.

186.    Each of the Defendants was aware of facts from which the inference could reasonably be drawn that Defendants had an opportunity to intervene and prevent the exacerbation of Mr. Hernandez's injuries and damages, yet did not do so and instead inflicted unnecessary pain and suffering.

187.    As a direct and proximate result of the aforementioned conduct of Defendants, Mr. Hernandez suffered catastrophic pain and suffering, emotional distress, and wrongful death.

188.    By reason of the above, Plaintiff, as the Administrator of Mr. Hernandez's estate, and on behalf of All Distributees and Next of Kin, brings this action to recover damages in an amount to be determined at trial.

189.    The egregious circumstances that surround the treatment of Mr. Hernandez while he was in DOCCS custody justify an award of punitive damages.

190.    Defendants' deliberate indifference and/or the direct refusal to provide necessary mental health care constitutes willful or malicious violation of Mr. Hernandez's constitutional, statutory, and civil rights.

191.    As a result, Plaintiff seeks punitive damages to be awarded as to this Cause of Action in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Medical Malpractice)**
**(Against OMH Defendants)**

192.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

193.    At all relevant times, the OMH Defendants were each medical professional duly licensed to practice in the State of New York. They were hired by DOCCS and/or OMH in those capacities.

194.    At all relevant times, the OMH Defendants held each of themselves out to the prisoners incarcerated in the custody of DOCCS, and in particular Mr. Hernandez, as medical professionals offering professional mental health services.

195.    At all relevant times, the OMH Defendants each represented themselves to be skilled, competent, and careful healthcare providers with the knowledge and capacity to practice medicine in accordance with the standards common and acceptable in the community.

196.    At all relevant times, each of the OMH Defendants stood in such a relationship with the other Defendants in their care and treatment of Mr. Hernandez as to make each of the

Defendants liable for the acts and omissions of all Defendants with regard to their mental health care, diagnosis, and treatment rendered to Mr. Hernandez or lack thereof.

197.    It was the duty of the OMH Defendants and their agents, servants, and/or employees to ensure that inmates with requisite emergent medical need are promptly taken to external medical providers for proper care and treatment including one-on-one Suicide Watch.

198.    From on or about May 29, 2019 through June 27, 2019, Mr. Hernandez sought the professional care of the Defendants for certain complaints, including but not limited to suicidal ideation, suicidal attempt, anxiety, and depression.

199.    OMH Defendants and their agents, servants, and/or employees rendered or purported to medical and nursing care, diagnosis, treatment, and services to Mr. Hernandez.

200.    Defendants failed to acknowledge, diagnose, or treat Mr. Hernandez's serious and progressive medical condition.

201.    As set forth herein, Defendants' psychiatric, medical, and nursing care, diagnosis, treatment, and services of Mr. Hernandez were rendered carelessly, recklessly, unskillfully, negligently, and not in accordance with accepted standards of psychiatric, medical, and nursing care, diagnosis, treatment, and services in the community as the standards existed at the time.

202.    Defendants did not possess the necessary skills to care for and treat Mr. Hernandez.

203.    Defendants neglected to apply the skills they did have.

204.    Defendants did not use reasonable care in applying the skills they had.

205.    Defendants were negligent and departed from the standard of care in other ways that are documented in the medical records and in ways of which Plaintiff is not yet aware.

206.   Mr. Hernandez's injuries were inflicted solely through the negligence of the Defendants, and through no fault or want of care or negligence or contributory negligence on the part of Mr. Hernandez.

207.   Defendants were aware of facts that gave rise to an unreasonable risk that Mr. Hernandez would be irreparably injured. It was foreseeable to the Defendants, based on facts known to them, that Mr. Hernandez was at risk of imminent serious harm including death. Yet, Defendants failed and/or refused to prevent Mr. Hernandez's mental health condition from worsening to the extent that they did.

208.   Defendants' conduct constitutes the tort of medical malpractice under the laws of the State of New York.

209.   This action falls within one or more of the exceptions set forth in CPLR § 1602, and as such, the Defendants are jointly and severally liable pursuant to the exceptions set forth in Article 16 of the CPLR.

210.   Pursuant to CPLR § 1602(2)(iv), Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to non-economic loss, by reason of the fact that Defendants' liability arose by reason of a non-delegable duty of care owed to Mr. Hernandez and/or by reason of the doctrine of *respondeat superior*.

211.   Pursuant to CPLR § 1602(7), Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to non-economic loss, by reason of the fact that Defendants acted in such a reckless manner as to completely disregard the consequences of their actions on the safety of others including Mr. Hernandez.

212.   As a direct and proximate result of Defendants' negligence, Mr. Hernandez suffered catastrophic pain and suffering, emotional distress, and wrongful death.

213.    By reason of the above, Plaintiff, as the Administrator of Mr. Hernandez's estate, and on behalf of All Distributees and Next of Kin, brings this action to recover damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (Negligence)
### (Against Clinton Officer Defendants)

214.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

215.    At all relevant times, the Clinton Officer Defendants were each correctional professional duly licensed to practice in the State of New York. They were hired by DOCCS and/or Clinton Correctional Facility in those capacities.

216.    At all relevant times, the Clinton Officer Defendants held each of themselves out to the prisoners incarcerated in the custody of DOCCS, and in particular Mr. Hernandez, as correctional professionals offering custodial care, supervision, and security.

217.    At all relevant times, the Clinton Officer Defendants each represented themselves to be skilled, competent, and careful healthcare providers with the knowledge and capacity to provide custodial care in accordance with the standards common and acceptable in the community.

218.    At all relevant times, each of the Clinton Officer Defendants stood in such a relationship with the other Defendants in their care and treatment of Mr. Hernandez as to make each of the Defendants liable for the acts and omissions of all Defendants with regard to their mental health care, diagnosis, and treatment rendered to Mr. Hernandez or lack thereof.

219.    It was the duty of the Clinton Officer Defendants and their agents, servants, and/or employees to ensure that inmates at a substantial risk of suicide are not left unattended or unsupervised at any time.

220.    From on or about May 29, 2019 through June 27, 2019, Mr. Hernandez was under the custodial care, supervision, and control of the Clinton Officer Defendants.

221.    Defendants failed to acknowledge Mr. Hernandez's serious and progressive condition or to provide requisite level of monitoring that he clearly required.

222.    Defendants failed to ensure that Mr. Hernandez would not have access to ligaments that he would foreseeably use to harm, injure, or kill himself.

223.    As set forth herein, Defendants' care, treatment, and services provided to Mr. Hernandez were rendered carelessly, recklessly, unskillfully, negligently, and not in accordance with accepted standards of care in the community as the standards existed at the time.

224.    Defendants did not possess the necessary skills to care for and monitor Mr. Hernandez.

225.    Defendants neglected to apply the skills they did have.

226.    Defendants did not use reasonable care in applying the skills they had.

227.    Defendants were negligent and departed from the standard of care in other ways that are documented in the medical records and in ways of which Plaintiff is not yet aware.

228.    Mr. Hernandez's injuries were inflicted solely through the negligence of the Defendants, and through no fault or want of care or negligence or contributory negligence on the part of Mr. Hernandez.

229.    Defendants were aware of facts that gave rise to an unreasonable risk that Mr. Hernandez would be irreparably injured. It was foreseeable to the Defendants, based on facts known to them, that Mr. Hernandez was at risk of imminent serious harm including death. Yet, Defendants failed and/or refused to prevent Mr. Hernandez's mental health condition from worsening to the extent that they did.

230.    Defendants' conduct constitutes the tort of negligence under the laws of the State of New York.

231.    This action falls within one or more of the exceptions set forth in CPLR § 1602, and as such, the Defendants are jointly and severally liable pursuant to the exceptions set forth in Article 16 of the CPLR.

232.    Pursuant to CPLR § 1602(2)(iv), Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to non-economic loss, by reason of the fact that Defendants' liability arose by reason of a non-delegable duty of care owed to Mr. Hernandez and/or by reason of the doctrine of *respondeat superior*.

233.    Pursuant to CPLR § 1602(7), Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to non-economic loss, by reason of the fact that Defendants acted in such a reckless manner as to completely disregard the consequences of their actions on the safety of others including Mr. Hernandez.

234.    As a direct and proximate result of Defendants' negligence, Mr. Hernandez suffered catastrophic pain and suffering, emotional distress, and wrongful death.

235.    By reason of the above, Plaintiff, as the Administrator of Mr. Hernandez's estate, and on behalf of All Distributees and Next of Kin, brings this action to recover damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Wrongful Death)**
**(Against All Defendants)**

236.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

237. As described more fully in the preceding paragraphs, the individual Defendants knew that Mr. Hernandez should be monitored as an active suicide risk, but failed to have him under such watch, resulting in Mr. Hernandez's wrongful death and the consequent injuries, losses, and damages to his next of kin.

238. Mr. Hernandez's next of kin are his surviving spouse, Liane Hernandez, his 19-year-old son Plaintiff Jose L. Hernandez, Jr., his 17-year-old daughter A.H., and his 14-year-old daughter G.H.

239. Liane Hernandez was the spouse of Decedent Mr. Hernandez, and, as such, was entitled to his services, society, comfort, consortium, contact, companionship, advice, counsel, love, affection, and support. By reason of Defendants' unconstitutional and otherwise unlawful conduct, Liane Hernandez was deprived of the services, society, comfort, consortium, contact, companionship, advice, counsel, love, affection, and support of her husband Mr. Hernandez, and suffered injuries, losses, and damages, both general and special.

240. Jose L. Hernandez, Jr. was a biological son of Decedent Mr. Hernandez, and, as such, was entitled to his services, society, comfort, guidance, contact, companionship, advice, counsel, love, affection, and support. By reason of Defendants' unconstitutional and otherwise unlawful conduct, Jose L. Hernandez, Jr. was deprived of the services, society, comfort, guidance, contact, companionship, advice, counsel, love, affection, and support of his father Mr. Hernandez, and suffered injuries, losses, and damages, both general and special.

241. A.H. and G.H. were each a biological daughter of Decedent Mr. Hernandez, and, as such, was entitled to his services, society, comfort, guidance, contact, companionship, advice, counsel, love, affection, and support. By reason of Defendants' unconstitutional and otherwise unlawful conduct, A.H. and G.H. were each deprived of the services, society, comfort, guidance,

contact, companionship, advice, counsel, love, affection, and support of their father Mr. Hernandez, and suffered injuries, losses, and damages, both general and special.

242.    Plaintiff Jose L. Hernandez, Jr., as Administrator of the Estate of Jose Luis Hernandez, brings this action for the conscious pain and suffering and for the wrongful death of Plaintiff's Decedent.

243.    Plaintiff, on behalf of all surviving distributees and the next of kin, including Plaintiff Jose L. Hernandez, Jr., Liane Hernandez, A.H., and G.H., claims damages for the wrongful death of Mr. Hernandez, including for their injuries, mental anguish, pecuniary and non-pecuniary losses, loss of Mr. Hernandez's services, protection, care, future income, assistance, society, comfort, consortium, guidance, contact, companionship, advice, counsel, love, affection, and support, and other expenses and damages, both past and future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jose L. Hernandez respectfully requests that judgment be entered against Defendants as follows:

a.   An award of compensatory damages for personal injuries, conscious pain and suffering, emotional distress, fear of impending death, wrongful death, economic damages, both general and special, and other harm, in an amount to be determined at trial;

b.   An award of punitive damages as to the First Cause of Action in an amount to be determined at trial;

c.   An award of pre- and post-judgment interest as permitted by law, for any and all monetary and/or non-monetary losses;

d.   An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988; together with

   e.   Such other and further relief at law or in equity as this Court may deem just and

        proper.

Dated:  New York, New York
        July 21, 2021

                              By:  _____
                                   Jaehyun Oh
                                   The Jacob D. Fuchsberg Law Firm, LLP
                                   3 Park Avenue, Suite 3700
                                   New York, New York 10016
                                   (212) 869-3500, ext. 245
                                   j.oh@fuchsberg.com

                                   *Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHEN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSE L. HERNANDEZ Jr., as Administrator of the Estate of JOSE LUIS HERNANDEZ, Deceased, and on behalf of All Distributees and Next of Kin, <br><br> Plaintiff, <br><br> -against- <br><br> J. WALDRON, U.C., SOHAIL GILLANI, M.D., SHANNA BALL, R.N., CORRECTIONAL OFFICER DERECK T. FLEMING, CORRECTIONAL OFFICER TRAVIS J. VIAU, and JOHN AND JANE DOES 1-10, <br><br> Defendants. | Civil Action No.: <br> 9:20-cv-01581 (DNH) (TWD) <br><br><br> **CERTIFICATE OF MERIT** |

JAEHYUN OH, the undersigned, an attorney duly admitted to practice in the Courts of New York State, states that she is an associate with The Jacob D. Fuchsberg Law Firm, LLP, attorneys for the Plaintiff in the within action. She has reviewed the facts of this case and has consulted with at least one physician who is licensed to practice in this State or any other state and whom she reasonably believes is knowledgeable in the relevant issues involved in this action, and she has concluded on the basis of such review and consultation that there is a reasonable basis for the commencement of this action.

Dated: New York, New York
      July 21, 2021

By: *Jaehyun Oh*
        Jaehyun Oh
        The Jacob D. Fuchsberg Law Firm, LLP
        *Attorneys for Plaintiff*
        3 Park Avenue, Suite 3700
        New York, New York 10016

45